UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL LUPU, et al.,

Plaintiffs,

v.

CITY OF OVID, et al.,

Defendants.

Case No. 1:25-cv-232

Hon. Hala Y. Jarbou

______________________________________/

**OPINION**

Daniel and Linda Lupu bring this lawsuit under 42 U.S.C. § 1983 and state law against the City of Ovid and Ovid Police Chief Lisa Rousseau.[1] Plaintiffs assert that Rousseau abused her powers as police chief while conducting a baseless investigation into whether a fire at Plaintiffs' home was caused by arson. Plaintiffs assert a Fourth Amendment unreasonable search and seizure claim, a First Amendment retaliation claim, a Fourteenth Amendment substantive due process claim, and a state-law defamation claim. Before the Court is Defendants' motion for summary judgment (ECF No. 45). Viewing the facts in the light most favorable to Plaintiffs, the Court finds that Rousseau violated the Fourth Amendment, but did not violate the Due Process Clause, the First Amendment, or Michigan defamation law; Rousseau is entitled to qualified immunity regarding the Fourth Amendment claim; and the City may not be held liable for Rousseau's Fourth Amendment violation. Accordingly, the Court will grant Defendants' motion and dismiss Plaintiffs' claims.

[1] Although Plaintiffs' complaint lists both Daniel and Linda as plaintiffs in the caption, all the claims within are brought by Daniel alone against Defendants. (*See* Compl., ECF No. 1.) Thus, even without reaching the issues discussed below, the Court would grant summary judgment to Defendants against Linda on that basis.

## I. BACKGROUND

### A. The Fire

This case stems from a fire at the Lupus' home on July 23, 2023. (*See* Lupu Dep. 24–26, ECF No. 45-6.) Daniel, who is himself a firefighter, was not home at the time. (*See id.* at 27.) Linda was at the house, but managed to escape safely. (*See id.*) The Fire Department came to the scene in response to a neighbor's 911 call (*see id.* at 26); Rousseau arrived shortly thereafter, by which time the fire was nearly extinguished (*see* Rousseau Dep. 70, ECF No. 45-7). Fire Captain Eric Brown, the officer in charge of the scene, told Rousseau that the fire was caused by a power surge in an air conditioning unit. (Rousseau Dep. 71; Police Rep. 3, ECF No. 45-2.) But Rousseau overheard a conversation between Brown and Fire Chief Herry Stevens in which Stevens seemed skeptical of the air conditioner theory. (Rousseau Dep. 80.) Rousseau noted in her police report that she was "puzzl[ed]" by the air conditioner explanation because "the air conditioner was not burned or charred." (Police Rep. 5; *see* Rousseau Dep. 92.)

Rousseau was also suspicious for other reasons. For one thing, she thought it was a conflict of interest for the Fire Department to investigate, and clear the name of, its own employees. (*See* Rousseau Dep. 82.) And this had happened before: in August of 2022, a fire had started in Captain Brown's garage. (*See id.* at 73, 98.) Rousseau thought the fire at Brown's house was suspicious because she presumed that firefighters should possess the expertise to avoid starting accidental fires. (*See id.* at 75–76.) A second fire at a firefighter's house within the same year seemed even more suspect, especially given that Brown was responsible for investigating and had immediately declared it to be an accident. (*See id.* at 102.) Rousseau also spoke to Linda at the scene and found her behavior odd: Linda appeared "distant" and "unemotional" and "didn't seem to be upset." (Rousseau Dep. 80.) Linda also told Rousseau that she was not worried because her daughter—who was the agent on the Lupus' home insurance policy—would "take care of" the Lupus by

writing a check. (*Id.*) Rousseau asked Stevens who would be investigating the fire, but he responded that nobody would investigate because "it's not like it's arson," then walked away. (*Id.* at 82.) Rousseau found Stevens's lack of engagement on the issue to be suspicious as well. (*Id.*)

**B. The Search and Seizure**

Rousseau concluded that the Fire Department was not going to sufficiently investigate the matter, so she decided to look into it herself. On July 30, 2023, she submitted an insurance fraud report to Auto-Owners, the provider of the Lupus' homeowners' insurance policy. (Rep. to Auto-Owners, ECF No. 45-19.) Her report stated, "I do not have proof/evidence only suspicions. I have concerns and would like to speak to the person that is trying to determine cause and origin of the house fire in Ovid a week ago on W. Front St." (*Id.*) Sherry Bos, an investigator for Auto-Owners, received the report and looked into the file on the Lupus' fire. She found that the file did not contain much information about the cause of the fire, and decided to do an additional investigation. (Bos-Lupu Interview 45, ECF No. 45-3.) Bos called Rousseau and asked about her suspicions; Rousseau explained her reasoning as set out above. (Rousseau Dep. 135.) On August 1, Bos told Rousseau's assistant "that they were going to reopen the investigation and that she needed the house secured" so she could visit it the following morning. (*Id.* at 137.)

Later that day, Rousseau went to the Lupus' house to check that it was secure for the Auto-Owners investigators. When she arrived, several workers from Ameri-Pro Restoration were moving boxes out of the house. (Bodycam Video 1 at 3:40, ECF No. 45, Ex. 10; *see also* Bodycam Video Tr., ECF No. 45-11.) Rousseau spoke with the workers while standing on the sidewalk in front of the Lupus' house, and informed them that she was the chief of police. (Bodycam Video 1 at 4:55.) They said they had been told that the house was no longer secured and they were allowed to remove items from it before repairs would begin. (*Id.* at 7:00–7:06.) Rousseau responded that the house was supposed to still be secured and no one was allowed inside. (*Id.* at

7:30.) Rousseau asked Bradford Miller, an Ameri-Pro employee, whether the company had done anything to the house to secure it. (*Id.* at 19:24.) Miller led her up the driveway to point out the boards that Ameri-Pro had put up on the side of the house. (*Id.* at 19:40–20:00.) When they returned to the front of the house, Daniel arrived and asked Rousseau why she was there. She told him that the insurance had reopened the investigation and she needed to secure the house. (*Id.* at 20:40–21:00.)

After Rousseau finished speaking with Daniel, Miller continued to lead her around to show her the alterations to the house. He took her through the front gate, which was open, and up the walkway to the door. Rousseau stood on the porch while Miller stood inside the house, but she did not enter; Miller then closed and locked the door to the house and locked the gate as well. (*Id.* at 22:40–24:00.) Daniel returned and argued further with Rousseau about the investigation. (*Id.* at 24:00.) Rousseau went to her car to retrieve police tape, and Daniel walked over and offered her the keys to the house. (*Id.* at 27:30.) Rousseau initially declined to take the keys, but Daniel told her, "If you're going to secure the house, I don't want to have nothing that I'm getting accused of." (*Id.* at 27:37.) Rousseau accepted the keys. (*Id.* at 27:34.) Daniel subsequently told the restoration workers to "let [Rousseau] do what she's got to do." (Bodycam Video 2 at 7:15, ECF No. 45, Ex. 10-2.)

Rousseau walked around the house again, including into the backyard, in order to put up police tape. (Bodycam Video 2 at 8:06.) She then spoke again with Daniel and discussed the potential causes of the fire. He told her that one of the restoration agents had suggested he ask Rousseau if she had a warrant and tell her to "kick rocks" if not, but Daniel responded, "I ain't doing to do that." (*Id.* at 16:50–16:55.) Rousseau told Daniel, "I don't think that would go over well," and Daniel responded, "No, 'cause I ain't hiding anything." (*Id.* at 16:55–17:00.)

Bos came to the house the following day, on August 2, and after examining the home she emailed the Lupus' daughter to say that the scene was released and the restoration workers could return. (8/2/2023 Email, ECF No. 45-12, PageID.498.) Auto-Owners continued to investigate the matter, and ultimately concluded that the cause of the fire was indeterminate. After finishing its investigation, Auto-Owners made an insurance payment to the Lupus in February of 2024.

**C. The Campaign**

On August 14, 2023, Daniel spoke at a City Council meeting and criticized Rousseau for stopping the restoration workers, making a fraud report to Auto-Owners, and allegedly entering his house without a warrant. (City Council Video 8:55–14:34, ECF No. 45, Ex. 12; *see also* City Council Meeting Tr., ECF No. 45-13.) City Council members responded that they would discuss the issue and investigate further. Mary Perrien, who was then a City Council member and is now the mayor of Ovid, suggested there was nothing for the Council to do on the matter. (City Council Video 14:50–14:55.)

In 2024, Daniel ran for mayor of Ovid against Perrien. In a campaign interview, he stated that City employees needed to have more "accountability" and specifically referred to the "inappropriate professional relationship between [Perrien] and [the] Chief of Police." (Campaign Article, ECF No. 45-15.) At some point during the campaign, Daniel drove a firetruck in a local parade while Rousseau was on duty directing traffic. Rousseau noticed that Daniel had a campaign sign on the firetruck, which she believed was an illegal use of government property. (Rousseau Dep. 192, 194.) Rousseau took a screenshot from her bodycam footage and sent it to several people, including the City Attorney and Travis Quimby, an officer who had applied to work at the Ovid Police Department. (*Id.* at 194–95.) Subsequently, someone anonymously posted the bodycam screenshot to a Facebook group—Rousseau denied that she had posted it, and indicated that Quimby was likely responsible. (*Id.* at 200.) Rousseau testified that she did not remember

why she had sent the video to Quimby, but stated that "[w]e were really, really close to him starting with us and he has a lot of experience and we communicated a lot. He was aware of some of, you know, the happenings, the ongoings surrounding the police department." (Rousseau Dep. 203–04.)

Rousseau filed a complaint with the Michigan Bureau of Elections regarding Daniel's use of the firetruck and some yard signs that did not include required disclosures. The Bureau concluded that Daniel had violated election law, but issued only a formal warning instead of a fine or criminal sentence. (Bureau of Elections Letter, ECF No. 45-16.) On October 11, 2024, Daniel made a campaign-related post on Facebook in which he accused Rousseau of targeting and harassing him. (10/11/2024 Facebook Post, ECF No. 45-17.) In the post, Daniel claimed that Rousseau "enter[ed] [his] premises, falsely claiming that [she] w[as] acting on behalf of the insurance company and removed the clean-up crew that was cleared to start the restoration process." (*Id.*) A week later, on October 18, Rousseau's attorney sent Daniel a cease-and-desist later that Rousseau also posted on her personal Facebook page. (Cease-and-Desist Letter, ECF No. 45-18.) The letter accused Daniel of defamation, stating among other things that Daniel had "falsely claimed that Ms. Rousseau entered [his] property . . . on behalf of the insurance company that was investigating a fraud complaint, and removed a clean-up crew." (*Id.* at 1.)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288–89 (1961)). Summary

judgment is not an opportunity for the Court to resolve factual disputes. *Id.* The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

"[T]he standard that a movant must meet to obtain summary judgment depends on who will bear the burden of proof at trial." *Trs. of Iron Workers Defined Contribution Pension Fund v. Next Century Rebar, LLC*, 115 F.4th 480, 488 (6th Cir. 2024) (alteration in original) (quoting *Pineda v. Hamilton County*, 977 F.3d 483, 491 (6th Cir. 2020)). "[W]hen the moving party bears the burden of proof [at trial], their initial summary judgment burden is higher in that [they] must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Id.* (cleaned up). When the moving party does not bear the burden of proof at trial, they may meet their initial burden at summary judgment by "submitting affirmative evidence that negates an essential element of the nonmoving party's claim," *Kava v. Peters*, 450 F. App'x 470, 473 (6th Cir. 2011) (cleaned up), or by "pointing out the lack of evidence to support an essential element" of that claim, *Rockwood Auto Parts, Inc. v. Monroe County*, 155 F.4th 557, 566 (6th Cir. 2025) (cleaned up). The nonmovant must then present "sufficient evidence from which a jury could reasonably find in [their] favor." *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1230 (6th Cir. 2025) (cleaned up).

## III. ANALYSIS

### A. Search and Seizure

Plaintiffs claim that Rousseau violated the Fourth Amendment by conducting a warrantless search and seizure of their property. Viewing the facts in the light most favorable to Plaintiffs, the Court finds that (1) Rousseau violated the Fourth Amendment, but (2) Rousseau is entitled to

qualified immunity, and (3) the City may not be held liable for Rousseau's actions. Thus, the Court will grant summary judgment to Defendants on Plaintiffs' Fourth Amendment claim.

**1. Merits**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "It is a basic principle of Fourth Amendment law . . . that searches and seizures inside a home without a warrant are presumptively unreasonable." *Kentucky v. King*, 563 U.S. 452, 459 (2011) (internal quotation marks omitted). Plaintiffs argue that Rousseau conducted an illegal search and seizure of their property during her visit to their home on August 1. Thus, the first question to address is whether a search and seizure took place.

As to the search, Rousseau did not actually enter the Lupus' home, but Plaintiffs argue that she walked onto the curtilage. "The curtilage—the area 'immediately surrounding and associated with the home'—is treated as 'part of [the] home itself for Fourth Amendment purposes.'" *Morgan v. Fairfield County*, 903 F.3d 553, 561 (6th Cir. 2018) (alteration in original) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). Curtilage includes areas of one's property "so intimately tied to the home itself that [they] should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* (quoting *United States v. Dunn*, 480 U.S. 294, 301 (1987)).

Here, undisputed facts establish that Rousseau entered the curtilage of Plaintiffs' home. Rousseau stepped into the backyard while putting up police tape, "[a]nd 'the law seems relatively unambiguous that a backyard abutting the home constitutes curtilage and receives constitutional protection.'" *Morgan*, 903 F.3d at 562. Rousseau also went onto Plaintiffs' front porch, which "is the classic exemplar of" curtilage. *Florida. v. Jardines*, 569 U.S. 1, 7 (2013). It is true that a police officer (like any member of the public) may walk onto a person's porch in order to knock on their door, as general social custom provides a license to do so. *Id.* at 9. But that customary

license is limited: "the background social norms that invite a visitor to the front door do not invite him there to conduct a search." *Id.* Here, because Rousseau stood on Plaintiffs' porch in order to examine the interior of the house, her actions did not accord with the general license provided to visitors, and therefore required independent legal authorization.

The Court also agrees with Plaintiffs that Rousseau seized their property when she stopped Ameri-Pro from working and barred anyone from entering the home. "A 'seizure' of property . . . occurs when there is some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook County*, 506 U.S. 56, 61 (1992) (internal quotation marks omitted). A person's possessory interests include the right to move personal property out of their house, and Rousseau plainly interfered with that interest. *Cf. Illinois v. McArthur*, 531 U.S. 326, 330 (2001) (describing police's refusal to let individual enter his home unsupervised as "temporary seizure"); *Cochran v. Gilliam*, 656 F.3d 300, 308 (6th Cir. 2011) (holding that police committed seizure by moving a person's property out of their house).

Even if Rousseau conducted a warrantless search and seizure, Defendants contend that Rousseau's actions were lawful because (1) Daniel consented to the search and seizure, and (2) the search and seizure were justified to prevent the imminent loss of evidence. The Court considers each argument in turn.

Consent can obviate the need for a warrant if it is "voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *United States v. Blomquist*, 976 F.3d 755, 758 (6th Cir. 2020). Consent "need not be explicit" and "may be in the form of words, gesture, or conduct." *Smith v. City of Wyoming*, 821 F.3d 697, 709 (6th Cir. 2016), *as amended* (May 18, 2016). "The burden to establish that the exception applies is on the officer invoking consent." *Andrews v. Hickman County*, 700 F.3d 845, 854 (6th Cir. 2012).

Rousseau contends that Daniel consented to the search and seizure when he offered her the keys to his house, then told the restoration workers to "let [Rousseau] do what she's got to do." (Bodycam Video 2 at 7:15.)[2] However, these instances of purported consent occurred after Rousseau had forced the restoration agents to stop working and entered the curtilage of Daniel's home (i.e., the porch), and they cannot retroactively render those actions lawful. *See United States v. Haynes*, 301 F.3d 669, 681 (6th Cir. 2002) (noting that subsequent consent cannot excuse prior Fourth Amendment violation); *United States v. Rogers*, No. 219CR20116, 2021 WL 825988, at *3 (W.D. Tenn. Mar. 4, 2021); *United States v. Rhodes*, No. CR 26-06, 2026 WL 2547419, at *5 (D. Mont. Aug. 28, 2026); *Reeves v. City of New York*, No. 24-cv-2408, 2026 WL 309532, at *10 (E.D.N.Y. Feb. 5, 2026). The question remains, though, whether Daniel consented to the later actions Rousseau took—namely, her entry into his backyard and the continuing seizure of his house. If so, the scope of Rousseau's potential Fourth Amendment violation would be limited to her initial conduct.

Plaintiffs argue that Daniel did not provide unequivocal, voluntary consent to the search or seizure. Daniel initially made it clear that he disagreed with Rousseau's decision to secure the property, and as he handed her the keys, he suggested that it made sense for her to have them "[i]f [she was] going to secure the house." (Bodycam Video 1 at 27:37.) In his deposition, Daniel explained that he gave her the keys because "if I wasn't allowed in there, there's no sense in me having the keys." (Lupu Dep. 84–85.) A statement does not qualify as consent if it is merely "a response conveying an expression of futility in resistance to authority or acquiescing in the officers' request." *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999). For example, in

[2] In their reply brief, Defendants also assert that Miller consented to the search as an agent of Plaintiffs. However, because this argument was raised for the first time in a reply brief, the Court will not consider it. *See Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

*Worley*, the Sixth Circuit upheld on clear error review the district court's finding that the statement "[y]ou've got the badge, I guess you can" did not establish voluntary consent. *Id.* at 386. Similarly, one could interpret Daniel's statement as indicating merely that he was complying with Rousseau's asserted authority to seize the property. And when Daniel told the workers to let Rousseau do her work, he may have just been instructing them to comply with her orders—not indicating that he agreed with them.

This interpretation is bolstered by the fact that Rousseau never explicitly asked Daniel if he consented to the search and seizure. The Sixth Circuit has left open the question of "whether the totality of the circumstances can ever support a finding of implied consent in the absence of an explicit request for permission." *United States v. Little*, 431 F. App'x 417, 420 (6th Cir. 2011). Even assuming that consent might in rare cases be inferred despite the absence of an explicit request, that absence still provides a strong reason to doubt the existence of consent here—after all, "logic dictates that a person cannot consent to a request that has not been made." *Id.*

Defendants point to several countervailing facts that weigh in favor of consent. First, Daniel justified his decision to give Rousseau the keys by asserting that he had nothing to hide. This suggests that Daniel consented to avoid any suspicion, not because he thought he had no choice. Second, despite one of the workers' suggestion that Daniel demand Rousseau get a warrant, he declined to do so. (Lupu Dep. 49.) When Daniel told Rousseau about his conversation with the worker, she responded, "I don't think [asking me for a warrant] would go over well," and Daniel replied, "No, cause I ain't hiding nothing." (Bodycam Video 2 at 16:55–17:00.) Defendants argue that this exchange indicates Daniel was aware of his ability to ask for a warrant but chose not to do so. On the other hand, Plaintiffs contend that Rousseau's response chilled

Daniel's ability to object to the search and seizure by implying that he could face consequences for refusing to comply.

The Court is ultimately not persuaded that Defendants have met their burden to establish voluntary, unequivocal consent. By the time Daniel arrived at the house, Rousseau had already taken control of the property and was acting as if she had the authority to do so. She never asked Daniel for permission or suggested that she needed his blessing to proceed.[3] Under those circumstances, it is not clear that Daniel's decision to hand her the keys or his statement to the restoration workers constituted voluntary consent to let Rousseau search and seize his property, rather than just acquiescence in light of her assertion of authority. As the Sixth Circuit has recognized, "[a] suspect's knowledge of a prior illegal search can also give rise to a sense of futility" in the face of police action, rendering their subsequent consent involuntary. *United States v. Haynes*, 301 F.3d 669, 683 (6th Cir. 2002). Thus, Defendants have not established that Rousseau's search and seizure were authorized by Daniel's consent.[4]

In the alternative, Defendants argue that the search and seizure were necessary to preserve potential evidence regarding the origins of the fire. "One well-recognized exception [to the warrant requirement] applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth

---

[3] Daniel also testified that at one point he asked Rousseau if she had a warrant, and she did not respond. (Lupu Dep. 83.) This exchange is not reflected in the bodycam footage, and it seems contradicted by Lupu's statement to Rousseau that he thought about demanding a warrant but chose not to. However, at this stage the Court interprets the facts in the light most favorable to Plaintiffs, so it credits Lupu's testimony that he did ask for a warrant. Although video footage might generally obviate the need to rely on contradictory testimony, *Scott v. Harris*, 550 U.S. 372, 378 (2007), not every conversation in the video is completely audible, so the occurrence of the alleged exchange cannot be completely ruled out. Regardless, the Court would reach the same result on both this issue and the qualified immunity determination below whether or not this exchange took place.

[4] Defendants also note that Daniel told Rousseau at one point, "[If] you want to come look, come look." (Bodycam Video 2 at 15:08–09.) However, the full quote is, "I was going to say, hey, [if] you want to come look, come look." (*Id.*) Thus, Daniel appears to be relaying a previous thought, not affirmatively inviting Rousseau to search. Moreover, this statement cannot function as consent to search because both of Rousseau's intrusions onto Plaintiffs' curtilage had already occurred at this point. And the statement does not suggest any consent to seize property.

Amendment." *King,* 563 U.S. at 460 (cleaned up). For example, when "police action literally must be 'now or never' to preserve the evidence of the crime, it is reasonable to permit action without prior judicial evaluation." *United States v. Ukomadu*, 236 F.3d 333, 337 (6th Cir. 2001) (quoting *Roaden v. Kentucky*, 413 U.S. 496, 505 (1973)). Thus, police may conduct a search or seizure without a warrant if they have probable cause to believe a crime has been committed and "an objectively reasonable basis for their belief that evidence [of that crime] will be lost or destroyed." *Id.* Defendants have the burden of establishing that the exigent circumstances exception applies. *O'Donnell v. Brown*, 335 F. Supp. 2d 787, 804 (W.D. Mich. 2004) (citing *United States v. Oliver*, 686 F.2d 356, 371 (6th Cir. 1982)); *see Taylor v. City of Saginaw*, 11 F.4th 483, 487 (6th Cir. 2021).

It is common knowledge that the cause of a fire can sometimes be determined by examining the physical scene, and it was plausible that the restoration workers would inadvertently destroy relevant evidence by moving items out of the house. Thus, Rousseau had an objectively reasonable basis for believing evidence would be lost. *Ukomadu*, 236 F.3d at 337. Under such circumstances, police officers are permitted to secure a location in order to preserve evidence. *See Segura v. United States*, 468 U.S. 796, 811 (1984). Insofar as Rousseau's searches were part of her efforts to secure the house—she entered the backyard to put up police tape, and stood on the front porch to observe the state of evidence inside—those searches are also justified by the exigency. Plaintiffs suggest that no exigency could have existed because the fire had occurred over a week ago, and Rousseau had made no attempt to secure the scene before August 1. But that fact is not dispositive, as Rousseau only became aware of the exigency when she discovered workers were moving items out of the house. In that moment, in order to preserve evidence, she told them to stop.

"Of course, a seizure reasonable at its inception because based upon probable cause may become unreasonable as a result of its duration . . . ." *Segura*, 468 U.S. at 812. Here, the seizure of the home lasted about 27 hours—from around 1:30 pm on August 1 to 4:44 pm on August 2. (*See* Bodycam Footage 1; 8/2/2023 Email, PageID.498.) To determine whether a seizure is justified under the exigency exception, courts compare the duration of the seizure to the time it would take for the police to obtain a warrant. *See United States v. Radka*, 904 F.2d 357, 363 (6th Cir. 1990). Here, Defendants make no effort to explain why such a long seizure was necessary before a warrant could be obtained. Indeed, the Sixth Circuit has held that a mere "seven-hour delay between the warrantless entry of the premises and the acquisition of a search warrant was inordinately long." *Id.* Thus, "[t]he record . . . fails to establish that the evidence sought would probably be destroyed within the time necessary to obtain a search warrant." *Id.* (cleaned up). Furthermore, it does not appear that Rousseau actually made an effort to apply for a warrant, and this lack of diligence also cuts against application of the exigency exception. *See United States v. Place*, 462 U.S. 696, 709 (1983) ("[I]n assessing the effect of the length of the [seizure], we take into account whether the police diligently pursue their investigation."); *Segura*, 468 U.S. at 809 (noting that the exigency exception applies when premises are secured "to preserve the status quo *while a search warrant is being sought*" (emphasis added)).

In short, even if a brief seizure was initially justified by the exigency exception, Defendants have failed to establish that the 27-hour seizure here was reasonable under the circumstances.

In addition, for the initial seizure to be justified, Rousseau must have possessed probable cause to believe a crime had been committed. "A police officer has probable cause . . . when the facts available to [them] would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (cleaned up). The

Supreme Court has declined to mathematically quantify probable cause, defining it instead as a "fair probability." *Id.* at 244. It has also emphasized that "probable cause is not a 'high bar.'" *Lester v. Roberts*, 986 F.3d 599, 608 (6th Cir. 2021) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the . . . officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). An officer's subjective reasons for acting are irrelevant to the probable cause analysis.[5] *Id.* at 153. While a jury must resolve any factual disputes regarding the information known to the officer at the time of the search, the question of whether those facts create probable cause is for the court to decide. *Gerics v. Trevino*, 974 F.3d 798, 806 (6th Cir. 2020).

Defendants point to the following facts as creating probable cause: (1) the unlikely nature of two fires occurring at two firefighters' homes in the same year; (2) the fact that Brown, a good friend of Daniel's (and someone who had experienced his own fire), was investigating; (3) the inadequacy of Brown's initial air conditioner explanation; (4) Stevens's refusal to investigate the issue; and (5) Linda's lack of concern about the fire. The Court finds that these facts do not establish probable cause.

The mere occurrence of a fire does not automatically create probable cause that a crime has been committed. *United States v. Waide*, 60 F.4th 327, 337 (6th Cir. 2023) (citing *Michigan v. Tyler*, 436 U.S. 499, 507 (1978)). Rather, additional facts must exist supporting an inference that the fire was caused by a person with criminal intent. None of the facts cited by Defendants are particularly strong evidence of a crime. Two fires occurring at two firefighters' homes could easily be a coincidence. The fact that Brown was investigating Daniel's fire is not necessarily

[5] For this reason, the fact that Rousseau apparently acted at the behest of the insurance investigator does not defeat probable cause. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.").

suspicious, given that they both work for a fire department in a small town. Although Rousseau may have been right to not believe Brown's air conditioner explanation, there was no reason to suspect a cover-up rather than simply an alternative non-criminal explanation. Stevens's refusal to investigate the issue can be explained by the fact that he did not think the fire had been caused by arson. Finally, it is possible that the trauma of escaping a fire caused Linda to appear unconcerned, or perhaps she simply lacked much emotional attachment to the house. Together, these facts do not create probable cause that arson had been committed.

To summarize: Daniel did not consent to the search and seizure of his home, and the exigency exception does not apply because the seizure lasted an unjustifiably long time and no probable cause existed. Thus, Rousseau's conduct violated the Fourth Amendment.

**2. Qualified Immunity**

Rousseau asserts a qualified immunity defense. "Qualified immunity protects public officials and those serving the public from the time, expense and risk of money-damages actions if they did not violate the claimant's clearly established federal constitutional rights." *DeLanis v. Metro. Gov't of Nashville & Davidson Cnty.*, 160 F.4th 732, 737 (6th Cir. 2025). "A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what [they are] doing violates that right." *Tlapanco v. Elges*, 969 F.3d 638, 648 (6th Cir. 2020) (cleaned up). "After a defending officer initially raises qualified immunity, the plaintiff bears the burden of showing that the officer is not entitled to qualified immunity." *Id.* at 647.

The Court finds that Rousseau is entitled to qualified immunity for two reasons. First, while the Court held above that Daniel did not consent to Rousseau's actions, it finds that the lack of consent was not clearly established as a matter of law. The case law cited above in the discussion of consent indicates that it is a close question whether a reasonable person faced with

the undisputed facts here would interpret Daniel's handoff of the keys as indicating his consent to Rousseau's decision to secure the house. For this reason, Rousseau is not liable for any portion of the search and seizure that occurred after Daniel provided her the keys.

Second, it was not clearly established that no probable cause existed to justify Rousseau's search under the exigency exception. Because the probable cause determination is fact-dependent, a plaintiff will generally have to "identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." *Lester*, 986 F.3d at 608 (cleaned up). An officer is entitled to qualified immunity if they "reasonably but mistakenly conclude that probable cause is present." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *see District of Columbia v. Wesby*, 583 U.S. 48, 65 (2018). In other words, an officer is not liable as long as they had "arguable probable cause." *Haywood v. Hough*, 811 F. App'x 952, 961 (6th Cir. 2020); *see Greene v. Barber*, 310 F.3d 889, 898 n.2 (6th Cir. 2002).

Even though the facts outlined above do not create probable cause, they *do* provide enough circumstantial evidence of foul play that Rousseau's belief in the existence of probable cause was a reasonable mistake. Plaintiffs do not cite, and the Court has not found, any case law clearly establishing that probable cause did not exist in an analogous scenario. Plaintiffs contend that it was clearly established that police need a warrant to enter a house to investigate a fire once the initial conflagration is over, *see Tyler*, 436 U.S. at 511–12, and that police who assist a private party in removing someone from their own property have committed a seizure, *see Bender v. Village of Mariemont,* 180 F.4th 861, 874 (6th Cir. 2026). But these cases do not clearly establish that Rousseau's actions violated the Constitution because they do not clearly establish that she lacked probable cause (and therefore that the exigency exception did not apply). For this reason, Rousseau is not liable for the initial search and seizure.

Thus, Rousseau is entitled to qualified immunity on Plaintiffs' Fourth Amendment claim, and that claim will be dismissed. The City of Ovid, as a municipal entity, cannot rely on a qualified immunity defense. *Myers v. Potter*, 422 F.3d 347, 352 (6th Cir. 2005). However, the City argues that it cannot be held responsible for Rousseau's actions. The Court addresses that argument next.

**3. Municipal Liability**

The City contends that it is not liable under § 1983 for any unconstitutional acts committed by Rousseau against Plaintiffs. "A municipality cannot be held liable under § 1983 on a *respondeat superior* theory—in other words, *solely* because it employs a tortfeasor." *Guptill v. City of Chattanooga*, 160 F.4th 768, 782 (6th Cir. 2025) (internal quotation marks omitted). Instead, to hold a municipality liable, a plaintiff "must show that through its deliberate conduct, the municipality was the moving force behind the injury alleged." *Id.* (internal quotation marks omitted). One way to do that is to show "that an official with final decision making authority ratified illegal actions." *Id.* Under such a theory, "[m]unicipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Id.* To hold the municipality liable, "the policymaker must have final authority to establish municipal policy with respect to the action ordered, which is a question of state law." *Id.* (internal quotation marks omitted).

Plaintiffs assert that Rousseau possessed the power to make policy regarding searches and seizures for the City of Ovid. The powers and status of a particular municipal official depend on that municipality's laws and practices. *See Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993). However, Plaintiffs do not support their argument with any citation to state or local law or with evidence regarding municipal custom. Rather, Plaintiffs appear to assume that a chief of police necessarily is a municipal policymaker, a claim that is belied by case law. *See, e.g.*, *Copeland v. Locke*, 613 F.3d 875, 882 (8th Cir. 2010) (holding city police chief was not final

policymaker regarding arrest practices). Plaintiffs' failure to even attempt to justify their contention that Rousseau is a final policymaker is sufficient reason to reject their argument. *See Kelly v. Borough of Carlisle*, 622 F.3d 248, 265 (3d Cir. 2010).

Moreover, the applicable local law appears to contradict Plaintiffs' position. The City of Ovid's charter contains the following relevant provision:

> The Council shall have the authority to maintain within the administrative divisions of the City, a City police force to enforce all laws and ordinances that are in force in the City and to preserve peace and good order in the City. The Chief of Police shall be appointed by the Council and shall be solely responsible to and serve at the pleasure of the Council. He or she shall be the executive officer of the Police Department and shall administer the department under policies, rules and regulations established by this Charter, the Council or by law.

Ovid, Mich., Charter § 3.12, https://library.municode.com/mi/ovid/codes/code_of_ordinances?nodeId=PTICH_CH3ORGO_S3.12PODEPOCH [https://perma.cc/7DTH-9J8N]. This provision does not appear to provide final policymaking authority to the chief of police; instead, it specifies that the policies of the police department are dictated by the City Council. *See Reguli v. Hetzel*, 178 F.4th 995, 1009 (6th Cir. 2026) (finding police captain lacked final policymaking authority because municipal code stated that "[a]ll police officers shall obey and comply with such orders and administrative rules and regulations as the police chief may officially issue" (alteration in original)). While Rousseau may have exercised discretion regarding search and seizure decisions in the moment, that fact does not establish her status as a municipal policymaker if the City Council retained final authority to dictate policy. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 & n.12 (1986) (plurality opinion); *Miller v. Calhoun County*, 408 F.3d 803, 814 (6th Cir. 2005). And though the City Council could have in practice delegated policymaking authority regarding searches and seizure to Rousseau, there is no evidence in the record regarding such a practice.

In the alternative, Plaintiffs argue that the City is liable for Rousseau's conduct because the City Council retroactively ratified it. It is true that "[a] municipality can . . . be held liable for

a subordinate's decision if the final policymaker ratifies a subordinate's decision, making it final." *Guptill*, 160 F.4th at 782. Plaintiffs argue that the City Council ratified Rousseau's conduct by failing to address the issue after Daniel informed the Council about Rousseau's actions. However, in order to establish municipal liability based on a ratification theory, a plaintiff must show that the "ratification was the moving force behind" the actions of the officer who committed the alleged violation. *Id.* at 783. For example, if a municipality has repeatedly ratified a course of unconstitutional conduct, that ratification may be the moving force behind future unconstitutional acts. *See Wright v. City of Euclid*, 962 F.3d 852, 882 (6th Cir. 2020). Or if a final policymaker ratifies the acts of a subordinate in the moment, that ratification might be a moving force behind those acts. *See Guptill*, 160 F.4th at 783. But "a policymaker's '*post hoc*' actions following an act of alleged malfeasance are not typically enough to show that the policymaker was the moving force behind a plaintiff's injury." *Id.* For instance, in *Guptill*, a superior's decision to not charge a subordinate in an internal investigation did not qualify as ratification because "after-the-fact" approval was not the moving force behind the earlier violation. *Id.*; *see also Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013) ("Fischer's after-the-fact approval of the investigation, which did not itself cause or continue a harm against Burgess, was insufficient to establish the *Monell* claim."). Similarly, Plaintiffs do not present any evidence that the Council's subsequent failure to address Rousseau's conduct was a moving force for her unconstitutional actions.

In short, Plaintiffs have failed to establish that the City of Ovid is liable for Rousseau's constitutional violations, so the Fourth Amendment claim against the City will be dismissed.

**B. Due Process**

Next, Plaintiffs argue that Defendants violated their Fourteenth Amendment due process rights by delaying their access to insurance proceeds. It is unclear from Plaintiffs' complaint

whether they intend to raise both substantive and procedural due process claims or merely the former. However, for the reasons explained below, Plaintiffs have failed to establish either claim.

"A procedural-due-process claim requires proof of the following two elements: '(i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process.'" *Novak v. Federspiel*, 140 F.4th 815, 821 (6th Cir. 2025) (quoting *Reed v. Goertz*, 598 U.S. 230, 236 (2023)). Plaintiffs assert that Rousseau's report of her suspicions to Auto-Owners caused a months-long delay in their receipt of insurance funds, and that this delay constitutes a deprivation of property. Defendants counter that a person has no property interest in a prospective benefit if the source of the benefit possesses unconstrained discretion regarding whether or not to provide it. *See Med Corp. v. City of Lima*, 296 F.3d 404, 409–10 (6th Cir. 2002). In such a case, "a prospective recipient of that benefit can establish no more than a 'unilateral expectation' to it." *Id.* at 410 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).

Although here the provider of the benefit (Auto-Owners) is distinct from the government official accused of a due process violation (Rousseau), the logic of *Med Corp* and *Roth* nonetheless applies. Because Plaintiffs ultimately received the insurance benefits to which they were entitled, their due process claim is merely that Rousseau deprived them of the right to receive the benefits immediately after the fire. But Plaintiffs provide no evidence that they possessed a contractual right to *immediately* receive the benefits. Insofar as Rousseau prevented immediate receipt, she merely denied Plaintiffs the satisfaction of their "unilateral expectation." In other words, because Auto-Owners had discretion to delay the distribution of benefits, the delay caused by Rousseau did not constitute a deprivation of property, and Plaintiffs cannot establish a procedural due process claim.

Like a procedural due process claim, a substantive due process claim requires an underlying deprivation of life, liberty or property. *Guertin v. State*, 912 F.3d 907, 922 (6th Cir. 2019). Thus, Plaintiffs' failure to identify a deprivation of property is fatal to their substantive due process claim as well. Moreover, Plaintiffs cannot establish a substantive due process claim because Rousseau's decision to report her suspicions to Auto-Owners does not "shock the conscience." *Cooperrider v. Woods*, 127 F.4th 1019, 1041 (6th Cir. 2025) (noting that characterization of behavior as conscience shocking "applies to only the most egregious official conduct, conduct that is so brutal and offensive that it does not comport with traditional ideas of fair play and decency" (cleaned up)).

In conclusion, the Court will dismiss Plaintiffs' due process claim.

**C. Retaliation**

Plaintiffs also bring a First Amendment retaliation claim against Rousseau for publicizing Daniel's violation of campaign finance law during the mayoral race and posting a cease-and-desist letter addressed to him on Facebook. Plaintiffs assert that these actions harmed Daniel's campaign and were taken in retaliation for his choice to run against Perrien. For the reasons explained below, Plaintiffs have failed to establish a retaliation claim regarding either action.

**1. State Action**

As an initial matter, Defendants argue that Plaintiffs cannot bring a § 1983 claim regarding Rousseau's conduct because it was not state action. As explained below, the Court finds that the campaign finance post constituted state action, but the cease-and-desist letter did not.

A § 1983 claim requires that a defendant's conduct took place "under color of" state law, 42 U.S.C. § 1983, or in other words, that the conduct constituted "state action," *Rudd v. City of*

*Norton Shores*, 977 F.3d 503, 512 (6th Cir. 2020).[6] Rousseau is a state officer, but "not every action undertaken by a person who happens to be a state actor is attributable to the state." *Waters v. City of Morristown*, 242 F.3d 353, 359 (6th Cir. 2001). A state actor's conduct constitutes state action if it "occurs in the course of performing an actual or apparent duty of [the actor's] office, or . . . the conduct is such that the actor could not have behaved as [s]he did without the authority of h[er] office." *Id.*

The post regarding Daniel's campaign finance violation included an image from Rousseau's bodycam footage, recorded as part of her official duties. Rousseau relied on her authority as an officer to copy an image from that video and provide it to Quimby. Although theoretically a non-officer could have obtained the footage through a public records request, Rousseau's position as an officer provided a much quicker and easier avenue for her to acquire the video. Thus, because Rousseau relied on her position as a police officer to obtain and disseminate the image, her conduct constitutes state action.

Defendants counter that in order to establish § 1983 liability for the actions of a private party under a concerted-liability theory, Plaintiffs must show coordination between Rousseau and Quimby. *See, e.g.*, *Rudd*, 977 F.3d at 512–13. But a concerted-action theory would only be necessary to hold *Quimby* liable as a state actor under § 1983; Rousseau's decision to give Quimby the footage was state action regardless of whether any coordination occurred. Of course, Rousseau did not actually post the image on Facebook, but a jury could find that Rousseau provided Quimby the footage with the expectation or intent that he post it—after all, in her deposition Rousseau was unable to articulate any other reason why she gave Quimby the footage. Under ordinary tort

[6] Similarly, the First Amendment (as incorporated against the states by the Fourteenth Amendment) applies only to state action. *See Rudd,* 977 F.3d at 512.

principles, Rousseau can he held liable for the results proximately caused by her decision to give Quimby the image, such as his decision to post it online.

Turning to the cease-and-desist letter, the Supreme Court has held that "an official's social-media activity counts as state action only if the plaintiff can show that the official (1) 'possessed actual authority to speak on the State's behalf' and (2) 'purported to exercise that authority when [s]he spoke on social media.'" *Lindke v. Freed*, 114 F.4th 812, 816 (6th Cir. 2024) (quoting *Lindke v. Freed*, 601 U.S. 187, 198 (2024)). The first prong requires that the post "relate to a specific matter within [the defendant's] portfolio of responsibilities." *Lindke*, 114 F.4th at 816. Although a police chief presumably has some authority to make public announcements, a post on Rousseau's page regarding alleged defamation does not fall within the scope of her official responsibilities.

Moreover, the second prong is not met because Rousseau did not purport to exercise any authority by posting the letter. Although the matters she discussed were tangentially related to her duties—insofar as some of Daniel's allegedly defamatory statements concerned her handling of the fire investigation—that fact is not dispositive. As the Sixth Circuit has explained, "it's unlikely that an official is purporting to exercise the authority of h[er] office when [s]he makes a statement that merely 'relates to' or 'concerns information learned during' h[er] public employment." *Id.* at 819 (quoting *Lindke*, 601 U.S. at 203). Similarly, the Sixth Circuit has held that sending a cease-and-desist letter threatening a private defamation lawsuit does not constitute state action even if the allegedly defamatory statements were related to the defendants' conduct in office. *Meadows v. Enyeart*, 627 F. App'x 496, 501 (6th Cir. 2015). As the court noted, "[b]ecause any person may hire a private attorney to threaten private legal action, it cannot be said that the letter was possible only because the Defendants were clothed with the authority of state law." *Id.* (cleaned up). Thus, Rousseau's post does not constitute state action.

**2. Merits**

Having concluded that only Rousseau's dissemination of the bodycam footage constitutes state action, the Court will proceed to the merits of Daniel's claim regarding that act. A First Amendment retaliation claim has three elements:

> (1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012). Daniel's decision to run for mayor was plainly constitutionally protected conduct. However, as discussed below, Daniel's retaliation claim fails because he cannot establish that Rousseau took an adverse action.

The Court is not persuaded that Rousseau's conduct—i.e., posting a picture on Facebook of Daniel in a public parade—would deter a person of ordinary firmness from running for office. Plaintiffs cite *Bloch v. Ribar*, where the Sixth Circuit held that disclosure of a person's private information qualified as an adverse action. 156 F.3d 673, 681 (6th Cir. 1998). But that case is readily distinguishable because Daniel's actions were quite public (and intentionally so). Few people would be deterred from running for public office based on the threat that someone will post a picture of them taken during a public parade. More importantly, because Rousseau's choice to publicize the video is itself an act of speech that receives First Amendment protection, that choice cannot constitute an adverse action. As the Sixth Circuit has explained, non-defamatory statements cannot constitute an adverse action because the contrary holding would "trample on the First Amendment rights that [Rousseau] retains as a government official." *Mezibov v. Allen*, 411 F.3d 712, 722 (6th Cir. 2005); *see also Blackwell v. Jones Day Law Firm*, No. 20-11493, 2021 WL 764124, at *20 (E.D. Mich. Feb. 26, 2021).

In sum, because Plaintiffs have not established that Rousseau took an adverse action against Daniel, their First Amendment claim will be dismissed.[7]

**D. Defamation**

Finally, Daniel brings a claim against Rousseau for defamation. Under Michigan law, defamation has the following elements:

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication.

*Ghanam v. Does*, 845 N.W.2d 128, 142 (Mich. Ct. App. 2014). "To be considered defamatory, statements must assert facts that are 'provable as false.'" *Id.* at 143 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990)). Statements of opinion are generally not defamatory, unless they "imply an assertion of objective fact." *Id.* Daniel claims that multiple statements by Rousseau were defamatory; the Court will address them in turn.

Plaintiffs first point to Rousseau's cease-and-desist letter. In that letter, Rousseau claimed that Daniel had posted a statement on Facebook "falsely claim[ing] that Ms. Rousseau entered [his] property . . . on behalf of the insurance company that was investigating a fraud complaint, and removed a clean-up crew." (Cease-and-Desist Letter.) Plaintiffs allege that these allegations are false. However, Plaintiffs' complaint does not identify the cease-and-desist letter as the basis of its defamation claim. (*See* Def.'s Reply Br. 19, ECF No. 54 (noting that the cease-and-desist

[7] Plaintiffs also suggest that Rousseau's report of Daniel's campaign law violation to the Bureau of Elections constituted retaliation. However, they do not plead this claim in their complaint, so they may not raise it now. *See Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007). Moreover, Plaintiffs cannot establish a retaliation claim regarding the referral because they do not contest that probable cause existed to believe Daniel violated the law. *See Amacher v. City of Tullahoma,* 179 F.4th 999, 1002–03 (6th Cir. 2026). Plaintiffs counter that the existence of probable cause does not defeat their claim if Rousseau selectively made referrals to the Bureau. *See id.* at 1006. However, Plaintiffs present no evidence that Rousseau declined to refer similarly situated people—i.e., others who violated campaign law—so they cannot establish selective enforcement.

letter cannot be the basis for the defamation count in Plaintiffs' complaint).) Rather, the complaint claims that Rousseau committed defamation against Daniel *before* he ran for office, when he was still a private citizen. (*See* Compl. ¶¶ 52–56, ECF No. 1.) Plaintiffs cannot raise a new claim in response to a motion for summary judgment. *See Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) ("To the extent [the plaintiff] seeks to expand its claims to assert new theories, it may not do so in response to summary judgment . . . . "); *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 787–88 (6th Cir. 2005).

Plaintiffs also point to Rousseau's statement to Township Supervisor Jennings West that "[Daniel] is saying a bunch of untruthful things." (Rousseau-West Video 8:29, ECF No. 34, Ex. 21; *see also* Rousseau-West Tr., ECF No. 45-22.) Rousseau counters that this statement was accurate because Daniel had said untruthful things at the City Council meeting. First, Rousseau points to Daniel's statements that on August 1, Rousseau was "there in the front room of [Daniel's] house" and that she "entered [his] house." (City Council Meeting Tr. 9–10, 12.) The bodycam footage shows that Rousseau never entered Daniel's house. Second, Rousseau points to Daniel's statement that "[p]olice don't investigate fires except for the Michigan State Police Department." (*Id.* at 12.) Rousseau notes that city police officers have the authority to enforce laws related to arson. *See* Ovid, Mich., Charter § 3.12 (providing police force with general law enforcement authority). Insofar as Daniel's statement is taken to mean that police as a matter of fact do not investigate fires, Rousseau testified that this claim is also false, and that she had previously investigated fires as a police officer. (Rousseau Dep. 35, 60.) In sum, no reasonable jury could find that Rousseau made a verifiably false statement when she asserted that Daniel had said untruthful things. Thus, Rousseau is entitled to summary judgment on the defamation claim.

## IV. CONCLUSION

As discussed above, Plaintiffs' Fourth Amendment claim against Rousseau is barred by qualified immunity, their Fourth Amendment claim against the City of Ovid is barred by the municipal liability doctrine, and they have established no other violation of law. Accordingly, Defendants are entitled to summary judgment on all counts.

An order and judgment will issue in accordance with this Opinion.

Dated: September 21, 2026

/s/ Hala Y. Jarbou
HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE